Tompkins, J.,
delivered the opinion of the Court.
This was an action of assault and battery, and false imprisonment, commenced in conformity to the. statute, in the Superior Court of the Territory, and afterwards transferred by law to the Circuit Court of St. Louis county. '
The declaration is in the common form ; the plea is special, and justifies by stating that the plaintiff' was the defendant’s slave ; the replication denies the plea, and tenders an issue, which is joined. Judgment for the plaintiff, at the February term of the year 1822. Exceptions to the opinion of the Court were filed, and from them it appeared, that about twenty-five years before, the defendant, with her husband, had removed from Carolina to Illinois, and brought from Carolina with them, the plaintiff, to Illinois, where they resided about three or four years, retaining the plaintiff, during the term of their residence in Illinois, in slavery, m Illinois. From Illinois, the defendant and her then husband removed to Missouri, bringing with them the plaintiff in this action, and still holding her as a slave. The counsel for the defendant prayed the Court to instruct the jury, that such a residence as was above mentioned, did not render the said Winny free,, under and by virtue of the ordinance of Congress of 1787, for the government of the territory of the United States, north west of the river Ohio, and also, that the law did not give the plaintiff more than nominal damages in this action. These instructions the Court refused {o give, but charged the jury, that if they believed the defendant and her then husband, resided in Illinois, with an intention to make that place the home of themselves and of the said Winny, they should find the issue for the plaintiff, and assess damages to her in this form of action, on the same principles as any other plaintiff might recover, in an action of false imprisonment.
To reverse the judgment of the Circuit Court, the defendant below brings her writ of error in this Court. ■
For the plaintiff in error, it was contended:
First. That by the articles of confederation, the Congress had no power, either to purchase the said Territory, or to forbid, by law, that slaves should he held in that Territory.
Second. That, admitting Congress had this right, and the slave taken in Illinois,, became free, the master’s right revived, so soon as he found the slave in Missouri, *335 unless the slave had, while residing there, asserted and obtained his freedom, by' the process of law.
Third. That the ordinance itself does not declare/the slave of a person settling in that Territory, becomes thereby free.
Fourth. Tnat only nominal damages could he recovered in this action.
A3 to the first point, we conceive that the States alone had a right to dispute the power of Congress, either to purchase the Territory, or to prohibit slavery within the Territory. The articles of confederation were intended to limit the powers of Congress over the States, and not those of the Congress over any Territory, that might in future be acquired; for, as was observed in argument, those articles of confederation do not seem to contemplate the acquisition of any Territory. It is most evident that the States have, by acquiescing in the act by which the Congress have acquired the Territory, given it their sanction ; and if we reflect, that after the adoption of the present federal Constitution, and the coi.sequent dissolution of the former government, the States procured, by their Represeniadves in Congress, to cause the lands within the limits of such Territory, to be surveyed and sold for their own use, and that they still derive from the salea of those lands a revenue to pay the debt of the nation, we must call it a very solemn sanction. To dispute, then, the power of Congress to purchase, is to- dispute the power of the Slatfes to receive. The Territory, then, being purchased, the States alone had the power to pronounce illegal, the ordinance made by the Congress, for the government of that Territory. And the Constitution, as we now have it made, since the acquisition of this Territory, has expressly placed this power of- regulating the Terrrilory, where alone it could be exercised, in the Congress. It is too late now to raise a doubt on that subject. It is a rule of the national, as well as of the common law, that the acts of a government de facto, are binding on all futuie governments. How, then, shall an individual, who, by settling there, recognized the power of the Congress, and assented to the articles of compact, pretend to dispute the authority of the agent with whom' he treated? To acquire propetty, is incident to sovereignty; so it is to make rules for the disposition and regulation thereof. To us it appears most minifest, that Congress had both power to acquiic the Territory, and to forbid the introduction of slaves.
It was urged, secondly, that though Congress had this rght, and the slave taken in Illinois beeajptfi’iree, yet the right of the plaintiff in error revived, so soon as the slave was found in Missouri, unless the slave had, while residing there, asserted and obtained his freedom, by the process of law.
In support of this point, it was said that the Slates being sovereign and independent, were, in this respect, in relation to each other, as foreign nations ; and that one nation would not execute the penal laws of another ; and that, if. a citizen of one country traveling into another, should there lose his horse, by means of a law there, contrary to our laws, that he would have a right to take his horse again, should he ever find it in his own country. To the latter part of this doctrine we do not agree, and if we did, we do not perceive its application to the present case. The territory is, and was then, the property of the States, and governed by a law enacted by the agents of those States, which law, the policy of those States, as well as their duty, requires them to Cause to be respected and executed. Huberus, quoted 3 Dallas, 375, says, personal-rights or disabilities, obtained or communicated by the laws of any particular place, are of a nature, which accompany the person wherever he goes. If this be the case, in countries altogether independent of each other, how *336 much more in the case of a person removing from this common Territory of all the States, to one of those States. An adjudication on those rights, in the country where they accrue, may be evidence of them, hut cannot give them. We are clearly of opinion, that if, hy a residence in Illinois, the plaintiff in error lost her right to the property in the defendant, that right was not revived hy a removal of the parties to Missouri.
It was urged, thirdly, that the slaves of persons settling in that country do not thereby become free. The words of the ordinance are, “that there shall be neither slavery nor involuntary servitude iri the said territory.” We did not suppose that any person could mistake the policy of Congress in making this provision. When the States assumed the right of self-government, they found their citizens claiming a right of property in a miserable portion of the human race. Sound national policy required that the evil should he restricted as much as possible. What they could, they did. They said, by their representatives, it shall not vest within these limits, and by their acts for nearly half a century, they have approved and sanctioned this declaration. What, then, shall be the consequence ? The common law judges of England, without any positive declaration of the will of the legislative body, availed themselves of every indirect admission of the master or lord, in favor of the liberty of his slave or villein, and the lord having once answered the villein by plea, in the Courts of common law, was never after permitted to claim the benefit of his services as a slave.
The sovereign power of the United Stales has declared that “neither slavery nor involuntary servitude shall exist thereand this Court thinks that the person who takes his slave into said territory, and by the length of his residence there indicates an intention of making that place his residence and that of his slave, and thereby induces a jury to believe that fact, does, by such residence, declare his slave to have become a free man. ' Rut it has been urged, that hy such a construction of the ordinance, every peí son travelling through the territory, and taking along with him his slave, might thereby lose his property in his slave. We do not think the instructions of the Circuit Court can be, hy any fair construction, strained so far j nor do we believe that any advocate for this portion of the species, ever seriously calculated on the possibility of subh a decision.
Lastly, it was urged, that the damages ought to he nominal. We think the Circuit Court decided correctly. In our opinion, the measure of danS^gs is the worth of the defendant’s labor; and any ill treatment during the time of the defendant being held in slavery, might have been given in evidence in aggravation of damages.
The judgment of the Circuit Court is affirmed.